Good morning. May it please the Court. Becky Walker-James for the Defendant and Appellant John Farahi. I'd like to reserve two minutes for rebuttal if possible. If possible. This case involves several erroneously applied sentencing guidelines adjustments, which I'd like to address today. Let me just interrupt you for one second. This is a huge pre-sentence investigation report, a revised report, and then a letter to the judge, and it's sealed. Why is it sealed? Well, they're always maintained under seal. The pre-sentence reports are always maintained under seal by the end of the rules. Yeah. Does this mean we can't talk about it in an open court? No, I don't believe so, Your Honor. We've always talked about pre-sentence reports. It's just that because there's so much personal information in there, the rules provide for the report itself to be kept under seal. But guidelines adjustments have been discussed in open court. Generally speaking, when we write dispositions on cases like this, we're not supposed to refer to anything that's been sealed. You're aware of that? Right. But I mean... Is there any reason why this should be sealed, if it's all out in the open anyway? Well, I think that the report should be maintained under seal under Rule 32. Are there bank records and things like that in there, or what's the... There are investor... I mean, there are victim names, investor names. Those all came out in open court. I actually think that the Chiquet Declaration was under seal as well. So there are names of individuals that may be private. And then there's also, of course, Mr. Farahi's personal and family information in there. So I think the report should be maintained under seal, but I think it is fine and routine for this court to refer to guidelines adjustments and the conclusions of the probation officer, because those were discussed in open court. So you're waiving any objection to us referring to anything in the sealed report in our disposition of the case, one way or the other? Well, I mean, I guess, yeah, I think so. I mean, I think the court can address these guidelines adjustments that are at issue and may have to make reference to what the pre-sentence report said. Yeah. Well, that's why I brought it up, because frequently we get told, no, you have to take this out of the disposition because it came out of the sealed records. You don't have any problem with that? No, I think everything that we're discussing here today is open to the public. So basically, Mr. Farahi's contention... When we reset the clock to 10 minutes, since we clarified this technical matter, it shouldn't come out of... Thank you. That's fair. So basically, Mr. Farahi's contending that his total points should be 28 with a resulting sentence range of 78 to 97, right? Right. For the 5K. Now, is there... All right. There was a plea and a number to, I think, what, four counts, and the number were dismissed. And there were... Are you contending that the prosecutor did anything that the prosecutor didn't agree to? No, we're not contending there was a breach. No, as a matter of fact, the prosecutor weighed in on your behalf on how many victims. Right. And the court overrode that. Right. There was an agreement to the number of victims that it was two levels and not four, but the district court imposed a four-level adjustment anyway. And they did abide by their recommendation to recommend nothing more than 120. To get down to 120. So they basically lived up to theirs, but the district court... Also in the agreement, my understanding is your client was advised that he faced 75 years and a very high fine plus restitution, right? Yes, I believe he was. And the ultimate sentence doesn't violate the high range, right? The statutory maximum? Well, what he was advised of when he pled. He didn't get anything more than what he was advised was the maximum. I believe that's correct, Your Honor. So the guidelines adjustments that are at issue here are the number of victims, which the court imposed above the party's agreement, for more than 50 victims rather than the 10 to 50 victims, the loss calculation of over $20 million, both of which were based on a failure of proof by the government. Also an erroneous imposition of $1 million from a financial institution. Now, what's the failure of... We understand, I mean, all these are in your brief. What's the failure of proof on the number of victims? On the number of victims, there was never any, I mean, first of all, never any discussion by either party, of course, on this issue, because the parties had agreed to 10 to fewer than 50. But the only evidence in the record was a list of investors that Ms. Shekay had come up with based in part on the receiver's list of claimants, but also adding her own from just her own review of the Newpoint records. And there was just nothing in that record to support that every one of those investors had actually been a victim of fraud. They had, you know, they had invested money with Newpoint. She determined the amount that they had invested had not been repaid as of April 13, 2009. But there wasn't any precision to say, you know, each one of these had in fact been told false statements, that they did not know the risk that they were undertaking. Well, you knew before the sentencing hearing that this fact was going to be introduced to the court, right, that there were more than 50? The probation office had recommended that, yes, Your Honor, and there was an objection to that. And, well, did your side do anything to try to counter what was in the record as to how many victims there were? Yes, Your Honor, the defense counsel did make that argument. So this list of 86 can't be considered fakes. Just made the argument. Were there any facts? Yes, there was. And the district court then made a factual determination? Well, it didn't really explain its determination. It just said it was going with preservations. Well, but it's pretty clear what the district court was relying on. Right. Well, I mean, just the list of 86 pretty much. But there was evidence. I mean, the defense pointed out that you can't consider that all of these 86 are victims. Many people knew the risks they were taking. Many people did get PPMs. Many people did get investor questionnaires. Were they identified? A couple were. A few were identified. A few examples. The defense counsel went through. I think that's our sealed excerpt, 85 to 86. And the government did not come forward with any evidence to show that all of these people were, in fact, victims of fraud. And that's really the point. I mean, it's the government's burden of proof here. And they, of course, didn't even attempt to do that because they had agreed to two levels. So I guess I'd just like to also address at this point the burden of proof. And as we've argued in our brief, in this case, it involves an extremely disproportionate impact, as the courts already alluded to, a 78 to 235 month swing. And we would contend that should be subject to clear and convincing standard of proof based on the totality of the circumstances articulated in the Jordan case and other cases in this circuit. And what follows from that? If we agree with you, what does that require? I think it would require remand, Your Honor, because it is not... Because the court didn't say when you believe the court was using the preponderance standard? I think a remand would be required to at least clarify the standard of proof. As to the loss amount, I mean, the failure is basically the same. To get to over 20 million, again, it was relying on this list of investors put together by the government's analysts. But again, there's just no evidence, certainly not clear and convincing evidence, to prove that all of these people and all of their losses, therefore, were actually the result...were defrauded and their loss is the result of that fraud. I'm sorry. And why do you think the analyst report is not enough? Well, Your Honor, it's just...all it does is it takes a list of people who invested in Newpoint, figures out what they had invested in, had not been repaid on April 13, 2009, but there's no analysis of what they were told, what they were given, what they knew about what they were investing in. So there's no way to know that all of those people... And you pointed this out to the district court? I'm sorry? You objected on that ground to the district court? Yes. I wasn't defense counsel in this report, but the defense counsel did... The defense did object, did point out specifically as to the number of victims... But you could have, if you knew they were doing it, defense counsel, not you personally, but the person representing the defendant, could have called those people in and said, oh, I'm not a victim. I don't want any money back. The defense could have, but that wasn't the defense's burden. Well, if I remember the record, too, the court pointed to the factual basis that the fraud started, admittedly, in 05. Right, but the factual basis in the plea agreement also specifically admitted to only $7 million, or over $7 million in fraud, not over $20 million, and that was a disputed issue. But didn't the prosecution reserve the right to argue for enhancements? Yes. Specifically. And this is an enhancement, right? Yes. Okay. So this enhancement was reserved. The two-level on the loss amount, that was reserved. They could argue for $22, and we could argue for $20. As to the victim adjustment, though, there was an agreement to two levels, so they did not reserve... Yeah, but on the loss amount, you knew that this was coming, or your side. Right. Well, and the defense did argue extensively about the loss amount, and that it was not supported, and it should have been under $20 million. And what's the standard review on this issue? I think it would be clear error, Your Honor, if it is a factual determination. The other issues, I mean, I would probably, based on the $1 million from the financial institution, the only issue was on the SunWest. And in that case, it's a simple issue that the linehead credit had already been drawn all the way down before any representations were made, so there was just no additional loss to the bank at that point. Well, but what happened after the representations were made? Then he ran it up again, and that money was lost. He paid it. Well, it was already completely gone. Then he repaid it, and then drew it down again. And then it was all lost. But the point is, by making those misrepresentations, he was able to engage in those transactions that eventually resulted in that loss to the bank. Isn't that right? Well, I mean, he really had that, but he was in just exactly the same position as he was before. I mean, the bank was in exactly the same position they were in before. They were out the $2 million. They had already done that before he ever made any misrepresentations. You've got about a minute left. Okay. We'll hear from the government. Thank you, Your Honor. May it please the Court, good morning. Paul Stern from the United States, also at counsel table is Aaron May, who handled the matter below with me. I'd like to start out by saying I strongly disagree with defense counsel's representation of the record below. There was no contest with regard to the status of the individual identified either on the receiver's report or on Ms. Shakay's declaration with respect to their status as victims. What was at contest, and when the issue of loss came up, was whether a defendant was entitled to an offset because the defendant had $9 million in a brokerage account that, according to the defense, at the time of detection of the fraud, was being reserved for use to pay off investors. So that amount should have been reduced. And in fact, defense, in terms of the loss analysis, relied on the receiver's report, which showed, the initial receiver's report showed approximately $13.5 million in losses. And then the second receiver's report, after subsequent distributions, showed $10.6 million. Those items were relied on by the defense counsel. And I'd also like to point to the record, in ER 206, 207, starting in 204, defense counsel discusses a sophisticated investment. 206? 206. Defense counsel was discussing, what came up in sentencing was defense counsel tried to argue. What line? The line is 24. It starts at 24, and it goes on to Now, does that mean? That's the line. Now, does that mean he's not a victim? No. He's a victim. I'm sorry. Who's speaking here? Counsel for defendant, Mr. Lindzenberg. Okay. Does that mean he's not a victim? This was a sophisticated investor identified by defense counsel to show that, look, there were some investors who knew about risk. And he says, he brings that to the court's attention. We would submit in mitigation, not because he's not a victim. He says, no, he's a victim because Mr. Faraki wasn't complying with all the rules and regulations. He didn't have full and complete disclosure of the fact that there was a commingled account, that he was trading Newpoint's accounts, that Newpoint was loaning money to him, that it was really a commingled account. That's in your brief. Well, I actually didn't – I cited to a portion – I argued in my brief that, in fact, he had conceded that all the people on these different forensic reports were victims. For this particular passage, I did not focus on – in my brief, perhaps I should have pointed this out, because it relates specifically to a claim that was made in the reply brief, which was that defense put in evidence that some investors were not, in fact, victims because they were sophisticated. I don't think that represents what was going on below them. And this specifically addresses the issue, that even investors who are aware of risk were victims. That is, they lost – to the extent they suffered losses, they were caused by defendant's criminal misconduct. And as I argued in my brief, because every person who bought, who invested, bought a security. And the defense in his plea agreement admitted he was unlawfully selling unregistered securities. There's nothing set beside the issue of whether everybody was defrauded, which we would submit the scope of his admission satisfies that as well. But there's nothing in the record to indicate that any security that was sold by Mr. Faragi through Newpoint-related entities was properly registered. He admitted he had – that was one of the accounts he pled guilty to. And it wasn't – there's nothing in the record to suggest that admission was limited. And consequently, anybody who suffered financial loss through this suffered it as the cause of the unlawful selling of unregistered securities. So – and that is why there was no victim-by-victim analysis that if that had been challenged, the government could have put in evidence at 302s with respect to every – all that meant over 75 victims, as Mr. Lasseter specified in his declaration, were interviewed, but that wasn't an issue. I'd just like to, since – unless the Court has any other questions. Well, I have questions about the over 50. What was your position on that, and what does the record, you know, I mean? Well, our position was we had stipulated to between 10 and 50 victims. We abided by that. The Court, in the context of litigating the issue of victims at sentencing, the Court – when the Court, in reviewing the forensic analysis of the victim losses, saw that all three of the forensic reports submitted, two by the receiver and one by Ms. Schicke, identified more than 50 victims. We simply recommended to the Court that, in accordance with our stipulation, that there should only be a two-level enhancement. That was agreed to before these forensic analyses had been completed. There was an issue about, you know, whether some people had been paid back or not. So we stipulated to between 10 and 50. We concurred with that. We didn't litigate it. We're just arguing we certainly reserve the right to defend. As part of settling the case. Correct. We reserve the right to defend the Court's decision on appeal. So counsel for the appellant says that the record doesn't support the Court's finding. Yes. So what's your answer to that? The answer is, as I argued, the Ms. Schicke's report, which included – which was based on the receiver's report, backed out monies that were paid back prior to the date of detection, identified 86 victims. And we would submit the evidence that certainly was not clearly erroneous. And I would also add the standard should be plain error. Well, strike that. On the victim issue, the standard is clear error. It's not clearly erroneous because it was based on, in the first instance, on Ms. Schicke's report. You're a little bit of a ready bunny. You sort of get wound up and you've got to ask the question and you just sort of go on to all these other things. Okay. Stop. Okay. The question is, I mean, what about the victims? Was there an objection? There was an objection to the more than 50 victims. Okay. So that's probably before us. Okay. So now there's an objection that there was not proof that there were in fact 50 victims. There were 50 investors, more than 50 investors, but defense counsel says not 50 victims. I want you to go into other stuff, just to answer that question. Yes. It was properly objected to below. It should be reviewed for clear error. Okay. And what's the evidence that there were victims? The evidence that there were victims is, one, they invested in Newpoint. Anyone who purchased a Newpoint security was a, and suffered a financial loss, was a victim of this crime because Mr. Farahi only sold, he unlawfully sold unregistered securities. He admitted to that. Stop. Stop. And what evidence is there as to which of those investors suffered a financial loss? That was based on the forensic reports compiled by the receiver and also by Ms. Chiquet that based on a review of bank records that was traced back that they invested, the bank records showed they bought debentures, and as of April 13, 2009, when you subtracted the principal repayments and the interest payments, they suffered a financial loss. The receiver did that, and Ms. Chiquet, based on the receiver's report, also analyzed people who had not submitted claims to the receivers, but had in fact invested with Newpoint. And she also said, as the guidelines require, subtracted monies for principal repayments and for interest. And that's where the numbers came that were contained on her report, which identified 86 victim investors who suffered losses of $22.9 million as of April 13, 2009. So some put in claims, right? Many put in claims, yes. How many put in claims? Approximately 55 put in claims. Well, yes. Your Honor, 55 are on the list. There were probably claims that were denied by the receiver because after their analysis they determined they got all their money back. Okay. How many were sustained claims? By the receiver, 55 approximately. 55 or 56. It's attached. Over 50. Yes, correct. And it's attached to Ms. Chiquet's declaration. And they're numbered. You can look at it. I think it's Exhibit B to the Chiquet declaration, and then Chiquet. That was before the district court. Yes, it was, Your Honor. That postdated the settlement of the case where you agreed you would be satisfied with 50. Yes, we did not have a copy of that when we entered into the plea agreement, that report. So it existed before you entered into the plea agreement? You know, I'm not certain that a final version of we knew the receiver was compiling the report. We were negotiating the plea agreement, and I do not believe it was finalized. Okay. And as to the  amount of loss. Well, the amount of loss is tied to that because there was the same report that was compiled by Ms. Chiquet, which she looked at how much each individual victim lost money. She subtracted for repayments of principal, repayments of interest, and she determined that there was $22.9 million in money that constituted net losses. And that was before the district court when it made its findings? It was, Your Honor. Now, the district judge did not give a fine, right? Just gave restitution? Or the fine could have given a very heavy fine? Correct. I think there may have been like a $5,000 fine. I mean, you can go check with J&C. But it could have been in the millions, and the district court said something to the effect, I would rather money go to the victims than to the court? That's correct. In Samara Bilgard's letter, she said a fine is not recommended. Well, perhaps there was no fine. Because any monies the defendant has available will be better used towards repaying the victim investors. That's correct. I would also like to point out that as part of the sentencing guideline loss, the court considered the $2 million to SunWest. So the court ultimately concluded that it was clear the amount of loss was over $20 million. The government took the position that the banks actually lost an additional $6.9 million. The banks? I'm sorry, the banks lost additional monies, and that should have also counted so that the total guideline loss was $36 million. And what's your answer to the SunWest allegation that there was no loss, because the $2 million was already gone, and then it ended up $2 million. Well, there are two. I mean, one, the two-level enhancement was an enhancement for receipt of gross receipts from a financial institution based on fraud. That there was an outstanding debt to SunWest relating to the earlier year is irrelevant to the question of the receipt of gross receipts from SunWest based on fraud. The defendant lied in his attempt to renew his application for 2009, and the evidence in the record which is unrebutted is that he was able to borrow money in 2009 based on the SunWest relied on his false statements and renewed his line of credit, and then they provided funds based on that. So it's clear that he received $2 million in gross receipts based on a renewal of the line of credit procured through fraud. The second then question is, did the fact that he had an outstanding debt to SunWest of $2 million that he paid back after the line of credit was renewed somehow reduce the loss? And we would submit, no, it doesn't reduce the loss. It has nothing to do with the loss. The repayment of that debt was just a debt that he had. There was no... So what do you say about all this proof that opposing counsel cited? As to the... The Chiquet Declaration and all the references to the receiver's report? Right. That's all in the record? Yes. And it was all before the district court? Yes. The Chiquet Declaration was before the district court. Including backing out principal and interest repayments and all the rest of that stuff. Yes. In her declaration she explains how she got there. What is it about her report that in and of itself is insufficient to support what the district court did? Well, again, because there's nothing in her report to say that these are victims of fraud or that they suffered losses as a result of the offense conduct here. I mean, we all lost money in 2008, 2009, right? You have to show that these people suffered losses in the amounts alleged as a result of... Well, they bought unregistered securities. Unregistered securities, period. Yeah, that's it. I mean, they bought unregistered securities, and they suffered loss. What else do you need? Well, Your Honor, the losses were not caused by the regulatory violations, though. I mean, if they, you know, the regulatory violations might have been a violation of the securities laws, but that did not cause the losses. It only caused, I mean, the victims' losses could only have been caused if they, you know, if they invested based on misrepresentations or based on something that Mr. Farahi did. Well, but they thought they were buying registered securities. That's fraud right there. Well, I don't think there's evidence in the record that they knew that or believed that. Well, but in the admission, his plea in his admission, he admits he sold them, you know, that he violated that law. So I don't think he can pull back on that. Well, he generally admits that to the violation alleged, and it's actually a single violation in the count of a single securities violation. The factual basis shows that the fraud started at 05, ran through 09, right? Right. He admits to fraud being committed during that time, but does not admit to, you know, there's not a specific victim list or any agreement to more than 20 million or more than 50 victims. And as to the unregistered securities, I mean, it's the same sort of level of generality. He'll be generally aware of the rules. You know, he sold the ventures through MPFS without following those rules and regulations. So it's a very general factual statement that doesn't provide the support for finding this amount of laws and this amount of victims. Thank you. I'm running out of time. Thank you, Your Honor. Okay. This is how you will submit. Then we'll take a brief recess before the last case on the calendar.
judges: KOZINSKI, TROTT, CALLAHAN